IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

PATRICIA HENTOSH,

    **Plaintiff**

    v.                                 **CIVIL NO. 2:12cv222**

OLD DOMINION UNIVERSITY,

    **Defendant.**

## ORDER

Patricia Hentosh ("Plaintiff") alleges that, in denying her application for tenure, Old Dominion University's ("ODU" or "Defendant") took retaliatory action against her motivated by Plaintiff's filing of a charge with the U.S. Equal Employment Opportunity Commission ("EEOC"). The matter is currently before the Court upon Defendant's Motion for Summary Judgment. ECF No. 21. For the reasons set forth herein, the Court: (1) **DENIES** Plaintiff's Motion for Leave to File Brief addressing the implications of Univ. of Texas Sw. Med. Ctr. v. Nassar, No. 12-484, 2013 WL 3155234 (June 24, 2013), ECF No. 51; (2) **DENIES** Plaintiff's Corrected Motion to Voluntarily Dismiss, ECF No. 55; and (3) **GRANTS** Defendant's Motion for Summary Judgment, ECF No. 21.

## CONTENTS

I.      FACTUAL BACKGROUND.................................................................................2

    A.    FACTUAL PREDICATE FOR PLAINTIFF'S DISCRIMINATION AND RETALIATION CLAIMS .................................................................4

        1.    Factual Predicate for Plaintiff's Discrimination Claims...............................4

        2.    Factual Predicate for Plaintiff's Retaliation Claims.....................................8

II.    PROCEDURAL HISTORY..............................................................................19

III.    PLAINTIFF'S MOTION FOR LEAVE TO FILE BRIEF ADDRESSING THE IMPLICATIONS OF UNIV. OF TEXAS SW. MED. CTR. V. NASSAR...............................................................................................22

IV.    MOTION TO VOLUNTARILY DISMISS PURSUANT TO FED. R. CIV. P. 41(A)(2)...............................................................23

    A.   STANDARD OF REVIEW.................................................................23

    B.   DISCUSSION..................................................................................24

        1.   Procedural History Underlying Plaintiff's Attempt to Voluntarily Dismiss the Instant Action ..........................................25

        2.   Voluntary Dismissal Would Permit Plaintiff to Circumvent An Adverse Ruling and Legally Prejudice Defendant.......................27

V.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ...................28

    A.   DEFENDANT'S MOTION IS NOT A PARTIAL MOTION FOR SUMMARY JUDGMENT ...........................................................................28

    B.   STANDARD OF REVIEW.................................................................29

    C.   DISCUSSION..................................................................................30

        1.   Plaintiff Fails to Produce Evidence That Retaliation Was the But-For Cause of Dr. Jeng's Participation in the College Committee's Consideration of Plaintiff's Tenure Application............................30

        2.   Plaintiff Fails to Produce Evidence That Retaliation Was the But-For Cause of Dean Mishoe's Refusal to Support Plaintiff's Tenure Application..............................................................................31

        3.   Plaintiff Fails to Produce Evidence That Retaliation Was the But-For Cause of Provost Carol Simpson's Denial of Plaintiff's Request for Further Review.....................................................34

        4.   Plaintiff Fails to Produce Evidence That Retaliation Was the But-For Cause of Defendant's Denial of Plaintiff's Tenure Application.........36

VI.    CONCLUSION ......................................................................................36

---

## I.    FACTUAL BACKGROUND

Old Dominion University is a public university located in Norfolk, Virginia. ODU is an equal opportunity employer. It is governed by a 17-member Board of Visitors ("Board"), with each member being appointed by the Governor. The Board appoints a President, which is ODU's highest administrative office. John R. Broderick ("Broderick") has served as ODU's President since 2008. The Office of the Provost, Vice President for Academic Affairs has

responsibility for all academic affairs at ODU, including faculty management.  Carol Simpson ("Simpson") has served as ODU's Provost, Vice President for Academic Affairs since 2008.

The academic community at ODU is divided into seven colleges.  The Dean of each college answers to the Provost, Vice President for Academic Affairs.  This case concerns the College of Health Sciences ("College of HS").  Dr. E. Andrew Balas ("Balas") served as Dean of the College of HS at times initially relevant to this matter.  At some point in 2010, however, Dr. Shelly Mishoe ("Mishoe") was chosen to serve as Dean of the College of HS.

The College of HS is divided into five schools, and the Chair of each School answers to Mishoe.  This case concerns the School of Medical Laboratory and Radiation Services ("School of MLRS"), which has since been renamed the School of Medical Diagnostic & Translational Sciences.  Deanne Shuman ("Shuman") served as Interim Chair of the School of MLRS at times initially relevant to this matter.  Sophie Thompson ("Thompson") served as the Chair of MLRS during later periods relevant to this case.

On February 25, 2005, Defendant advertised for a full-time, tenure-track position in the College of HS.  The solicitation for that position provided:

> The candidate will teach clinical molecular diagnostics and research statistics at both the undergraduate and graduate levels, assist in the development of a graduate program, and foster collaborative research initiatives with the local medical community.  The candidate will also be expected to establish partnerships with clinical biotechnology industries pioneering the development of instrumentation and methodologies in the area of clinical molecular diagnostics. The candidate will be expected to develop and maintain an active research program supported by external funding.

Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 8, ECF No. 22-8 (emphasis added).  ODU hired Plaintiff, a White female, for that position in January 2006.  Plaintiff served as a full Professor at ODU, subject to reappointment on a year-to-year basis, until June 2013.

3

This case arose from Plaintiff's interactions with H. Anna Jeng ("Jeng"), an Associate Professor in ODU's School of Community and Environmental Health ("School of CEH"). Jeng is an Asian female. As set forth in detail below, Plaintiff alleges that she maintained a contentious relationship with Jeng throughout her time at ODU. It was ODU's alleged handling of that relationship which gave rise to the discrimination and retaliation claims set forth in the Complaint. The issue currently before the Court is whether Defendant, in denying Plaintiff's application for tenure, took retaliatory action against Plaintiff motivated by her filing of a charge with the EEOC.

A.    FACTUAL PREDICATE FOR PLAINTIFF'S DISCRIMINATION AND RETALIATION CLAIMS

1.    Factual Predicate for Plaintiff's Discrimination Claims

According to the Complaint, Plaintiff is is a resident of Norfolk, VA. Until January 2013, Plaintiff served as a Professor in ODU's School of MLRS. Compl. ¶¶ 3, 7. Plaintiff is a White female. Compl. ¶ 8. Beginning in 2008, Plaintiff began to share laboratory space with Jeng, an Associate Professor in ODU's School of CEH. Compl. ¶¶ 9, 13. Jeng is an Asian female. Compl. ¶ 10. Plaintiff contends that she observed a number of unsafe laboratory practices by Jeng, and that she raised these concerns on a number of occasions both with Jeng and ODU staff. Compl. ¶¶ 14-15.

On March 9, 2009, Jeng allegedly sent an email to: (1) Thompson, Chair of the School of MLRS; and (2) James English ("English"), Chair of the School of CEH. In that email, Jeng states that she felt Plaintiff: (1) was attempting to interfere with Jeng's work; and (2) had created a hostile work environment. Jeng warned that if Plaintiff continued to interfere she would seek legal action. Compl. ¶ 18. Plaintiff alleges that Jeng's email violated ODU Policy, but that

ODU took no action against Jeng because Jeng is a member of a racial minority.  Compl. ¶¶ 19-20.

On March 16, 2009, it is alleged that English sent an email to: (1) Provost Simpson; and (2) Balas, then Dean of the College of HS.  The email allegedly describes Plaintiff's safety concerns about Jeng as "harassment and intimidation."  Compl. ¶ 23.  Thereafter, Provost Simpson allegedly urged English and Balas to "control" Plaintiff.  Plaintiff contends that Provost Simpson also initiated an investigation into Jeng's hostile work environment allegations against Plaintiff.  Compl. ¶ 24.  Plaintiff alleges that, unbeknownst to her, responsibility for the investigation was assigned to Senior Investigator Barbara Reynolds ("Reynolds").  Compl. ¶ 25.

On March 17, 2009, Plaintiff contends that she received an email from Balas "implicitly admonishing" her for raising concerns about Jeng's laboratory practices and "implicitly warning" Plaintiff not to raise such concerns in the future.  Compl. ¶ 26.  Plaintiff indicates that she was upset by this email, and that she went to the ODU Equal Opportunity/Affirmative Action Office ("EO/AA"), where she explained her concerns to Traci Daniels, Director of EO/AA.  Compl. ¶ 28.  According to Plaintiff, Daniels persuaded her not to file a formal grievance, and instead to use an "informal procedure" through EO/AA.  Compl. ¶ 28.  On March 20, 2009, Daniels called Plaintiff and informed her that Barbara Reynolds would be handling the "informal procedure."  Compl. ¶ 29.  According to the Complaint, Daniels never informed Plaintiff that a hostile work environment investigation was being carried out against Plaintiff, or that Barbara Reynolds was conducting said investigation.  Compl. ¶ 29.

On April 1, 2009, Reynolds met with Plaintiff to discuss Plaintiff's relationship with Jeng.  According to the Complaint, Plaintiff believed that this meeting was a follow-up to her complaint against Jeng, but in reality, Reynolds was meeting with Plaintiff as part of her

investigation into Jeng's hostile work environment claim against Plaintiff. Compl. ¶ 30. Plaintiff claims that during this meeting, Reynolds told Plaintiff that her reporting of safety concerns could be seen as racist because Jeng is Asian, and that Plaintiff should either: (1) report her complaints about Jeng to Sophie Thompson, and no one else; or (2) leave ODU. Compl. ¶¶ 31-32. Plaintiff contends that after the April 1, 2009 meeting, she never heard anything from EO/AA regarding the "informal procedure" initiated to investigate her complaints against Jeng. Compl. ¶ 32.

On April 27, 2009, Reynolds submitted a report—the "Reynolds Report"—of her investigation into Jeng's hostile work environment claim. Reynolds found that Plaintiff had violated ODU's "Disruptive Behavior Policy for Faculty and Faculty Administrators." Compl. ¶ 39. On May 15, 2009, Balas issued Plaintiff her annual written performance evaluation, which stated: "The incident surrounding your comments on Dr. Jeng's laboratory generated particular concerns. . . . Based on the findings of EO/AA Office, I need to make it clear that your behavior and interactions with Anna Jeng were unacceptable and . . . further negative interferences with colleagues will result in more severe sanctions." Compl. ¶ 42. According to Plaintiff, this was the first she had heard of an EO/AA investigation into Jeng's hostile work environment allegations. Compl. ¶ 45.

On May 18, 2009, Plaintiff complained to ODU administration that she had not been notified of the hostile work environment investigation against her. According to Plaintiff, Renee Dunman, Director of ODU's Office of Institutional Equity and Diversity, refused to provide Plaintiff with a copy of the Reynolds Report. Compl. ¶ 46. Plaintiff then contacted Balas, requesting a copy of the Reynolds Report and complaining that she had not been informed of the investigation against her. Plaintiff also allegedly asked Balas how she could appeal the findings

6

in the Reynolds Report. Compl. ¶ 47. Dunman apparently told Balas that, procedurally, there was no way to appeal because no complaint had been filed against Plaintiff. Compl. ¶ 49.

On June 2, 2009, Plaintiff filed a Discrimination Complaint Form with ODU alleging, among other things, retaliation by Jeng and English. Compl. ¶ 50. According to Plaintiff, ODU informed Plaintiff that her allegations did not raise an inference of discrimination as to Jeng, and thus that Jeng would be excluded from any investigation. Compl. ¶¶ 51-52. On August 10, 2009, Plaintiff met with James D. Wright ("Wright"), ODU General Counsel, to protest the statement relating to the incident with Jeng contained in Plaintiff's written performance evaluation. The aforementioned statement was subsequently revised, albeit minimally. Compl. ¶¶ 55-58.

On November 23, 2009, Plaintiff, by counsel, sent a letter to Wright requesting that the April 27, 2009 Reynolds Report be retracted and expunged from her employment record. Compl. ¶ 60. ODU denied the request. Compl. ¶ 61. On May 11, 2010, Plaintiff, by counsel, submitted to ODU a written grievance—the "2010 Grievance"—challenging ODU's denial of her request for retraction and expungement of the Reynolds Report. Compl. ¶ 65. On March 1, 2010, Plaintiff's husband and former ODU professor, Dennis Peffley ("Peffley"), submitted a Freedom of Information Act ("FOIA") request to the National Institute of Health ("NIH") concerning an NIH-funded study being conducted by Jeng at ODU. Compl. ¶ 63. According to Plaintiff, Peffley made this FOIA request so that he could evaluate "potential business opportunities . . . relating to the subject matter of the study." Compl. ¶ 63.

On May 20, 2010, Plaintiff filed a charge of discrimination with EEOC alleging discrimination on the basis of race and retaliation in violation of Title VII. Compl. ¶ 66. On June 25, 2010, Jeng filed a formal complaint with ODU EO/AA accusing Plaintiff of engaging in

disruptive behavior against her with respect to Peffley's FOIA request. Compl. ¶ 67. According to Plaintiff, ODU immediately launched an investigation of Jeng's claim against Plaintiff. Compl. ¶ 68. ODU allegedly hired a private investigator, John Di Dio ("Di Dio"), to conduct the investigation. Compl. ¶ 69. Di Dio reached the conclusion that "a reasonable person could conclude that" Plaintiff had violated ODU policy and discriminated against Jeng. Compl. ¶ 71.

On July 19, 2010, the ODU Faculty Grievance Committee announced that it would not investigate Plaintiff's 2010 Grievance. Compl. ¶ 72. On December 3, 2010, Shuman, Interim Chair of ODU's School of MLRS, sent a letter to Plaintiff notifying her that "Dr. Jeng has claimed that you created a hostile work environment, and an independent investigator has found that a hostile work environment, in fact, exists." Compl. ¶ 74. Plaintiff met with Shuman on December 14, 2010. Compl. ¶ 74. On February 4, 2011, Shuman issued a written reprimand to Plaintiff based on Jeng's 2010 complaint against Plaintiff. Compl. ¶ 75. Plaintiff objected to the written reprimand, arguing that it was issued outside the time period permitted under the ODU Faculty Handbook. In response, Shuman retracted the written reprimand but retained the findings as a "counseling memo" in Plaintiff's employment record. Compl. ¶ 78.

## 2.    Factual Predicate for Plaintiff's Retaliation Claims

As set forth above, Plaintiff was hired in January 2006 for a full-time, tenure-track position in the College of HS. The solicitation for that position provided that:

> [t]he candidate will teach clinical molecular diagnostics and research statistics at both the undergraduate and graduate levels, assist in the development of a graduate program, and foster collaborative research initiatives with the local medical community. The candidate will also be expected to establish partnerships with clinical biotechnology industries pioneering the development of instrumentation and methodologies in the area of clinical molecular diagnostics. The candidate will be expected to develop and maintain an active research program supported by external funding.

Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 8, ECF No. 22-8 (emphasis added).

Defendant has a formalized tenure review process set forth in the Faculty Handbook.  See generally Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 1, at 50-65, 315, ECF No. 31-2.  The Handbook provides that "tenure is awarded only after a suitable probationary period, and the decision to award tenure is based both on the merit of the individual faculty member and on the long-term needs and mission of the department, the college, and the university."  Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 1, at 50, ECF No. 31-2.  The probationary periods begins upon hire to a full-time, tenure-track position at the rank of Professor.  The maximum length of the probationary period is seven academic years.  An eligible faculty member receives a decision concerning their tenure application from the Provost, Vice President for Academic Affairs on or before April 15 of their sixth year on probation.  The faculty member will receive tenure or, alternatively, be offered a terminal contract in the seventh year.

While in this probationary period, Plaintiff was issued a series of reviews which discuss Plaintiff's satisfaction of the expectations set forth in the aforementioned solicitation and, more generally, the requirements for tenure set forth in the Faculty Handbook.  Plaintiff received her Second Annual Review by the Promotion and Tenure Committee for the School of MLRS ("MLRS Promotion and Tenure Committee") on October 31, 2008.  Under "Scholarship," the MLRS Promotion and Tenure Committee stated that Plaintiff had "published two articles in peer-reviewed publications since coming to Old Dominion University in February 2006," "published or presented five abstracts at professional meetings," received "two internally funded grants," and "applied for 10 external grants, including six from the National Institutes of Health."  In her Second Annual Review, the MLRS Promotion and Tenure Committee voted three in favor, zero against, Plaintiff's reappointment.  Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1, at 30, ECF No. 22-1.

Plaintiff received her Third Annual Review on May 5, 2009.  This review, issued at the mid-point of Plaintiff's professorship, was conducted by the Promotion and Tenure Committee of the College of Health Sciences ("HS Promotion and Tenure Committee").  This review occurs three years after hire and three years prior to a faculty member's application for tenure. Therefore, it is specifically intended to advise faculty members concerning their progress toward tenure.

Under "Research and External Funding," the HS Promotion and Tenure Committee noted that Plaintiff listed "2 publications since joining the ODU faculty in 2006, both of which she is listed as third author" and "6 conference abstracts and presentations since 2006."  With respect to external funding, Plaintiff still had only secured two internally funded grants, and submitted only "11 grants to external federal agencies."  In other words, Plaintiff made little progress in her research and external funding efforts from her second to third annual reviews.  Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1, at 34-36, ECF No. 22-1.

Accordingly, the HS Promotion and Tenure Committee found that "Dr. Hentosh's record of research and scholarship does not demonstrate sufficient progress toward tenure and promotion to assure that her application in two years will be competitive."  Therefore, the HS Promotion and Tenure Committee made a series of recommendation to improve Plaintiff's tenure prospects.  The Committee "strongly recommend[ed] that . . . [Plaintiff] build the number of senior authored publications in her field which is needed to document a well defined research area needed to be competitive in obtaining external funding."  The Committee stressed that "[b]oth publications and external funding" would prove "vital at the time of her tenure application."  Additionally, the Committee found fault with Plaintiff's service in the academic community, noting "little evidence of her service at a national level and encourag[ing] her to

10

build on her earlier track record of NIH and other funded Cancer research to increase her national visibility, consistent with expectations of the rank of Professor." Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1, at 34-36, ECF No. 22-1.

The HS Promotion and Tenure Committee concluded Plaintiff's Mid-Tenure Review by expressing its strong support for Plaintiff, but also "quite realistically conclude[d] that Dr. Hentosh has not made consistent progress toward tenure at the Professor rank." To aid her, the Committee made four recommendations to improve the prospects of any future tenure application. Amongst them, the Committee recommended that Plaintiff "[i]ncrease her track record of external—particularly NIH—research funding." Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1, at 34-36, ECF No. 22-1.

Plaintiff submitted her tenure application for consideration in 2011. The Faculty Handbook sets forth very detailed criteria for the evaluation of tenure candidates. With respect to merit, the Handbook provides that ODU will consider "[m]erit of the faculty member in teaching, research, and service over the entire probationary period and the contributions made by the faculty member in these areas to the university." Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 1, at 52, ECF No. 31-2.

For evaluation of "teaching, research, and service" in the tenure review process, the Handbook incorporates those standards set forth in the section concerning "Evaluation of Faculty." With respect to research, the Handbook provides that, amongst other things, a tenure applicant will be assessed based on publications, grants, and contracts. With respect to publications, the Faculty Handbook provides that persons reviewing a tenure application

> should take into consideration and comment upon the reputation and editorship of journals in which the faculty member has published and the nature of the reviews received for published books. Evaluation of the quality of the publication is essential. For major personnel decisions e.g., tenure and promotion) external

11

evaluations of the publication are encouraged and may be required.

Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 1, at 58, ECF No. 31-2. In assessing grants and contracts, the Handbook provides that reviewers

> should take into consideration the aggressiveness with which the faculty members have sought out research opportunities considering their availability of opportunities in their fields), the effectiveness with which faculty members have met the requirements established by the funding agency, the effectiveness with which the faculty members have worked with graduate assistants and colleagues, and the leadership which faculty members have provided on particular grants as principal investigator, co-principal investigator, or major participant).

Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 1, at 58, ECF No. 31-2.

The first stage of consideration in ODU's tenure review process is conducted by tenured faculty within a candidate's department. A department may elect a committee of a specified size from its membership to conduct tenure deliberations. Once complete, the department's committee makes a recommendation to the department chair.

In Plaintiff's case, this first stage of consideration was conducted by the Promotion and Tenure Committee of the School of Medical Laboratory and Radiation Services ("MLRS Promotion and Tenure Committee"). The MLRS Promotion and Tenure Committee issued its Memorandum concerning Plaintiff's tenure application on September 29, 2011. The Committee declined to support Plaintiff, voting two in favor, two against her application. Under "Scholarship," the MLRS Promotion and Tenure Committee noted that "[s]ince arriving at ODU, Dr. Hentosh has four published peer reviewed articles, one book chapter in press, and one additional publication submitted." The Committee also found that she had "nine abstracts of which she is first or senior author on six of them." As for funding, the MLRS Promotion and Tenure Committee found Plaintiff had two grants, both from internal sources. She had submitted 19 grant applications, 8 of which were to the NIH. On these and other facts, the MLRS Promotion and Tenure Committee found "that Dr. Hentosh's performance in the area of

scholarship did not fully meet expectations for tenure." Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1, at 37-39, ECF No. 22-1.   In accordance with the Faculty Handbook, the MLRS Promotion and Tenure Committee's memorandum and recommendation were forwarded to Thompson, then Chair of the School of MLRS.

The second stage of consideration in ODU's tenure review process is an independent assessment by the department chair.   In Plaintiff's case, this second stage of consideration was conducted by Thompson, when then served as Chair of the School of MLRS.   On October 12, 2011, Thompson sent a letter to Mishoe, Dean of the College of HS, recommending Plaintiff for tenure. Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 39, ECF No. 31-42.

The Faculty Handbook provides that if the department committee, department chair, or both recommend tenure, then the faculty member's application proceeds for consideration at the college level.   Though the MLRS Promotion and Tenure Committee declined to support Plaintiff's tenure application, Thompson recommended her for tenure.   Thus, Plaintiff's application proceeded for further consideration within the College of Health Sciences.

The third stage of consideration in ODU's tenure review process is an assessment by a committee of tenured faculty within the candidate's college.   According to the Faculty Handbook, "[a]ll members of college promotion and tenure committees shall be elected directly by the faculties they represent.   The college committees shall consist of one tenured faculty member from each department in the college. This member shall be chosen by majority vote . . . by secret ballot . . . ." Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 1, at 56, ECF No. 31-2. Thus, each of the five schools within the College of Health Sciences elects one person to serve on the HS Promotion and Tenure Committee.   Jeng was chosen, by such election, to represent the School of Community and Environmental Health.   The Faculty Handbook does not provide a

13

mechanism by which a member of a college promotion and tenure committee may be removed, even where their participation is alleged to raise the prospect of a conflict-of-interest.  See generally Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 1, ECF No. 31-2.

In Plaintiff's case, this third stage of consideration was conducted by the Promotion and Tenure Committee for the College of Health Sciences ("HS Promotion and Tenure Committee"). The evidence before the Court shows that, at the time of Plaintiff's tenure application, Jeng was a duly-elected member of the HS Promotion and Tenure Committee.

Prior to the HS Promotion and Tenure Committee convening to consider Plaintiff's tenure application, Plaintiff contacted Thompson, then Chair of the School of MLRS, concerning Jeng's presence on the Committee.  On September 22, 2011, Plaintiff sent Thompson an email stating that "I [Plaintiff] think it best that I request that Anna Jeng recuse herself from my tenure review—any idea how I can go about this??"  Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 24, ECF No. 31-27.  Thompson replied on September 24, 2011, stating that she would "talk to the Dean [Mishoe] about Anna when she gets back."  Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 25, ECF No. 31-28.  On September 29, 2011, Plaintiff again emailed Thompson claiming that she had been told "some time ago that it is possible and that others had requested something like this) to have one member not serve on the tenure committee for various reasons, but that an outsider could be substituted or included."  Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 26, ECF No. 31-29.  There is no evidence of further correspondence concerning Jeng's participation on the HS Promotion and Tenure Committee.  Thus, there is no evidence that Plaintiff formally requested Jeng's recusal, nor is there evidence that Plaintiff persisted in her efforts to secure Jeng's recusal.

The HS Promotion and Tenure Committee convened and issued its findings concerning Plaintiff's tenure application on November 1, 2011. Jeng participated in the Committee's consideration of Plaintiff's tenure application. Though the HS Promotion and Tenure Committee found that Plaintiff's teaching met the standards expected of tenured faculty, she fell short in other categories. The Committee noted, in discussing "Research and External Funding," that Plaintiff's success in obtaining external funding was "lower than expected." The HS Promotion and Tenure Committee ultimately found that Plaintiff's "scholarly activities fall below expectations of a tenured faculty member." In discussing "Service," though noting Plaintiff's participation in a number of school and college committees within ODU, the HS Promotion and Tenure Committee "recommended that . . . [Plaintiff] advance her national presence and strive to take a leadership role on school, college, and university committees." The HS Promotion and Tenure Committee ultimately voted against Plaintiff's tenure application, the vote being one in favor, four against. Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 27, ECF No. 31-30.

On November 8, 2011, Plaintiff sent another email to Dean Mishoe and Chair Thompson expressing confusion "as to why . . . [her] request to either replace Anna Jeng with someone else on the . . . [Committee] or at least have her recuse herself was not honored." Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 28, ECF No. 31-31. Dean Mishoe's reply, dated November 8, 2011, provides:

> Please be assured that Anna Jeng's participation as an elected member of the Promotion and Tenure Committee for the College of Health Sciences is not indicative that your concerns have not been addressed. In fairness to the tenure review process, your concerns were addressed in a manner that did not presume the bias of Jeng or any committee member. In keeping with academic freedom and integrity, the tenure review process (through voting and progressive stages of independent decision making) ensures fairness in the consideration of your merits, along with the long-term needs and mission of the school, college and university.

Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 28, ECF No. 31-32.

Apparently dissatisfied with Dean Mishoe's response, Plaintiff then emailed Chandra R. Desilva ("Desilva"), Vice Provost for Faculty Development.  Plaintiff's email, dated November 9, 2011, inquired as to: (1) whether it is possible for a tenure applicant to request that a substitute faculty member serve on a promotion and tenure committee when a duly-elected member of the committee has a major conflict of interest; and (2) whether there were any examples of such substitution in the past.  Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 28, ECF No. 31-33. Desilva replied in the negative, stating that "I am not aware of such an instance where a faculty member has objected to being evaluated by a college P&T [Promotion and Tenure] committee member due to a conflict of interest."  Desilva emphasized that, though theoretically possible, the conflict "would have to be a major one (not just difference of opinion in the past) because" the committee member "would be only one in a committee of several senior faculty."  Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 28, ECF No. 31-33.

The Faculty Hanbook provides that, upon receipt of the college committee's recommendation, the college dean then reviews the application and makes an additional evaluation and recommendation concerning tenure.  Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 1, at 53, ECF No. 31-2.  Thus, in Plaintiff's case, the fourth stage of consideration was an independent assessment by Mishoe, Dean of the College of Health Sciences.  Mishoe sent a letter to Provost Simpson, dated December 15, 2011, declining to support Plaintiff's application for tenure.  Mishoe stated that she was "concurring with the decisions of both the School and College Committees, which do not support tenure for Professor Patricia Hentosh."  Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 28, at 1, ECF No. 31-34.  Mishoe noted that Plaintiff had "been unable to establish a research program in cancer research or related areas, reflected by her lack of grants, publications and national presentations."  Plaintiff also had "obtained . . . no

16

externally funded grants." Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 28, at 1-2, ECF No. 31-34. Thus, Mishoe concluded that "[i]n research and scholarly activities since joining ODU in 2006, Dr. Hentosh's scholarship, publications and external funding are below the level expected for tenure." Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 28, at 2, ECF No. 31-34.

The Faculty Handbook provides that if the college committee, college dean, or both recommend tenure, then the faculty member's application proceeds for consideration at the university level. However, if neither the college committee nor college dean recommends tenure, then further consideration requires the applicant to "request a further review by the provost and vice president for academic affairs." Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 1, at 54, ECF No. 31-2 (emphasis added).

The Schedule for Faculty Seeking Tenure sets forth relevant dates in ODU's tenure review process. The Faculty Handbook in effect when Plaintiff applied for tenure provides that the College Dean makes it recommendation concerning tenure on or before December 20, 2011. The next entry on the schedule provides that "[i]n those cases where the faculty member requested further review because neither the department/school committee nor the department/school chair recommends tenure, the faculty member may request a review by the provost and vice president for academic affairs if neither the college committee nor the dean recommends tenure." Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 2, at 313, ECF No. 31-2 (emphasis added).

In Plaintiff's case, neither the HS Promotion and Tenure Committee nor Dean Mishoe recommended tenure. Thus, pursuant to the "Schedule for Faculty Seeking Tenure" set forth in the appendix of the Faculty Handbook, Plaintiff was required to request further review of her

17

application on or before December 20, 2011.  Defendant did not submit a request for further review on or before December 20, 2011.

On February 10, 2012, nearly two months after the deadline for requesting further review, Plaintiff sent separate inquiries concerning how she might request further review by Provost Simpson to: (1) James D. Wright ("Wright"), Associate University Counsel for ODU; and (2) DeSilva, Vice Provost for Faculty Development.  On February 13, 2012, Wright responded and referred Plaintiff to Desilva. Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 32, ECF No. 31-35.  Desilva replied on Feburary 10, 2012 and explained that, when neither the college committee nor dean recommend tenure, an applicant's materials are not forwarded for consideration at the university level.  Desilva recommend that Plaintiff make a request in writing to Provost Simpson, who would then decide whether further review was warranted.  Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 33, ECF No. 31-36.

Nearly one month later, on April 6, 2012, Plaintiff sent a 42-page request for further review to Provost Simpson.  That request alleged defects in ODU's consideration of her tenure application when it was before the: (1) MLRS Promotion and Tenure Committee; (2) HS Promotion and Tenure Committee; and (3) Dean Mishoe of the College of HS.  The request further expressed concern that some and/or all of the acts of the entities which voted to deny her tenure "have been acts of discrimination and retaliation against me [Plaintiff] in violation of Title VII of the Civil Rights Act of 1964."  Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 34, ECF No. 31-37.

Provost Simpson replied on April 11, 2012.  Simpson explained that the names of all approved tenure candidates had been forwarded to ODU's Board of Visitors for final consideration on April 4, 2012.  Simpson further explained, as set forth above, that in order to

request further review Plaintiff was required to notify her on or before December 20, 2011. Plaintiff waited until April 6, 2012, nearly four months after that deadline, before submitting a request for further review. Finding that Plaintiff "did not appeal in a timely manner," Provost Simpson stated that she was unable to consider Plaintiff's request for further review. As such, she advised Plaintiff that her tenure application had been denied, and she would be offered a terminal contract for the 2012-2013 academic year. Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 35, ECF No. 31-38.

Again, apparently dissatisfied with that response, Plaintiff again emailed Provost Simpson on April 12, 2013 complaining that neither Wright nor Desilva mentioned a deadline when she sent her initial inquiries concerning further review. Simpson replied and explained that, because [t]he deadlines are in the Faculty Handbook's schedules," nothing more could be done. Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 36, ECF No. 31-39. Plaintiff then contacted Desilva, stating that Provost Simpson had denied her request for further review and inquiring as to whether there was anything more she could do. There is no evidence in the record of further correspondence concerning Plaintiff's request for further review. Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 37, ECF No. 31-40.

On June 8, 2012, Plaintiff was offered an untenured, terminal contract to serve as a Professor in the School of MLRS for the 2012-2013 academic year. Plaintiff accepted that appointment on July 16, 2012. Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 38, ECF No. 31-41.

## II.    PROCEDURAL HISTORY

On May 26, 2010, Plaintiff, a White female, filed a Charge of Discrimination based on race with the EEOC—number 437-2010-00727 (hereinafter "First EEOC Charge"). On January 26, 2012, the EEOC issued Plaintiff a Notice of Right to Sue on that First EEOC Charge. Based

on that letter, Plaintiff filed the instant civil action on April 24, 2012.  Plaintiff's Complaint alleged discrimination based on two purported employment-related actions: (1) a negative remark found in her annual performance evaluation, which was issued on May 15, 2009, Compl. ¶ 42, ECF No. 1; and (2) an April 27, 2009 finding that Plaintiff, through her interactions with Jeng, had violated ODU's "Disruptive Behavior Policy for Faculty and Faculty Administrators," Compl. ¶ 39, ECF No. 1.  The Complaint further alleged that Defendant took retaliatory action against Plaintiff in relation to her application for tenure.

Defendant filed a Motion to Dismiss on June 22, 2012, ECF No. 5, which was fully briefed as of July 23, 2012.  On August 3, 2012, the Court issued an Order granting in part and denying in part Defendant's Motion to Dismiss.  Ord., ECF No. 13.  The Court found that the allegations of discrimination set forth in the Complaint—namely, the negative performance evaluation and Defendant's finding that Plaintiff violated ODU Policy—were not timely raised with the EEOC and could not be heard by this Court.  The Court further found that Plaintiff's EEOC Charge wholly failed to address the question of discrimination in promotion or advancement, and none of the claims raised in that First EEOC Charge were sufficiently related to Plaintiff's tenure retaliation claim to satisfy the requirement that she exhaust administrative remedies prior to filing her Complaint.  Therefore, the Court dismissed the discrimination claims set forth in the Complaint, leaving only the allegation that Defendant took retaliatory action against Plaintiff in relation to her application for tenure.  See generally Ord., ECF No. 13.

On August 23, 2012, approximately three weeks after issuance of the Court's Order on the Motion to Dismiss, Plaintiff filed a second EEOC Charge of Discrimination—number 437-2012-00931 (hereinafter "Second EEOC Charge").  That Second EEOC Charge alleges that: (1) Defendant discriminated against Plaintiff on the basis of race in relation to Plaintiff's

application for tenure; and (2) Defendant took retaliatory action against Plaintiff in relation to her application for tenure. Plaintiff did not, therefore, advance any new claims in that Second EEOC Charge. Rather, Plaintiff's filing of the Second EEOC Charge sought to remedy the defects that led to dismissal of her discrimination claims in the instant action. Unfortunately, Plaintiff did not feel compelled to provide this Court with timely notice of that Second EEOC Charge, nor did she move for a stay of these proceedings at that early stage of the litigation before the undersigned.

Defendant filed its Motion for Summary Judgment on March 13, 2013. ECF No. 21. On March 28, 2013, Plaintiff filed a Brief in Opposition to Defendant's Motion for Summary Judgment. Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J., ECF No. 31. Defendant filed its Reply Memorandum on April 3, 2013. ECF No. 37. On April 15, 2013, the Court scheduled a Motion hearing to address Defendant's Motion for Summary Judgment, as well as a Motion to Stay and Consolidate filed by Plaintiff. The hearing was initially scheduled for May 20, 2013 but, due to a scheduling conflict, the hearing was reset to occur on May 28, 2013.

On May 21, 2013, with her Motion to Stay and Consolidate Cases still pending, Plaintiff proceeded to file with the Court a separate Complaint based on her Second EEOC Charge. That matter, docket number 2:13cv290, is currently pending before District Judge Henry C. Morgan, Jr. That same day, however, Plaintiff also filed in this matter an Amended Motion to Consolidate and Stay Proceedings in this matter. ECF No. 46. Plaintiff's Amended Motion sought to stay these proceedings and consolidate this matter with that now pending before Judge Morgan. On May 28, 2013, all parties appeared before the Court for a motions hearing, at which the Court heard argument concerning Defendant's Motion for Summary Judgment and Plaintiff's Motions to Stay and Consolidate. The Court took the motions under advisement pending further

21

review and advised the parties that it would issue opinions on each. <u>See</u> Min. Entry, ECF No. 49.

On June 4, 2013, the Court issued an Order denying Plaintiff's Motions to Stay and Consolidate. The Court explained that granting such motion would prejudice Defendant because: (1) the case before the undersigned and that before Judge Morgan are at vastly different stages of litigation; and (2) consolidation would permit Plaintiff to remedy what appears to be a failure to pursue discovery on her retaliation claims. The Court further stated that it was disinclined to grant such Motion because Plaintiff did not properly exhaust her administrative remedies under Title VII prior to commencing this action, thereby leading to her filing of the second action pending before Judge Morgan. Ord., ECF No. 50.

On June 25, 2013, Plaintiff filed a Motion for Leave to File Brief addressing the implications of the Supreme Court's opinion in <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>. Pl.'s Mot. for Leave to File Brief, ECF No. 51; <u>see also</u> Pl.'s Mem. in Supp. of Mot. for Leave to File Brief, ECF No. 52. On July 1, 2013, Plaintiff filed a Motion to Voluntarily Dismiss. Pl.'s <u>Corrected</u> Mot. to Vol. Dismiss, ECF No. 55; <u>see also</u> Pl.'s Br. in Supp. of Mot. to Vol. Dismiss, ECF No. 54.

### III. PLAINTIFF'S MOTION FOR LEAVE TO FILE BRIEF ADDRESSING THE IMPLICATIONS OF <u>UNIV. OF TEXAS SW. MED. CTR. V. NASSAR</u>

On June 24, 2013, the Supreme Court issued its opinion in <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, which held that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." 2013 WL 3155234, at *10 (citing <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 176 (2009)). On June 25, 2013, Plaintiff filed a Motion for Leave to File Brief addressing the implications of <u>Nassar</u>. Pl.'s Mot. for Leave to File Brief, ECF No. 51; <u>see also</u> Pl.'s Mem. in Supp. of Mot. for Leave to File Brief, ECF No.

52.     That Motion requests that Plaintiff "be permitted to submit a brief addressing the implications of this new law for her case, and that she be granted a reasonable time in which to do so and in which to submit a brief in reply to any brief submitted by Defendant." Pl.'s Mem. in Supp. of Mot. for Leave to File Brief 2, ECF No. 52.

Rather than await for the Court's leave, Plaintiff proceeded to file a Motion to Voluntarily Dismiss on July 1, 2013. Pl.'s Corrected Mot. to Vol. Dismiss, ECF No. 55; see also Pl.'s Br. in Supp. of Mot. to Vol. Dismiss, ECF No. 54. Plaintiff's Motion to Voluntarily Dismiss addresses the implications of Nassar and requests, pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure, that the Court dismiss the retaliation claims before the undersigned without prejudice. Pl.'s Br. in Supp. of Mot. to Vol. Dismiss 10, ECF No. 54.

The Court **DENIES** Plaintiff's Motion for Leave to File Brief addressing the implications of Nassar. ECF No. 51. Rather than await the Court's leave, Plaintiff proceeded to file her Motion to Voluntarily Dismiss, which addresses Nassar's implications. There is, therefore, no reason to grant Plaintiff Motion, as Plaintiff has already taken it upon herself to do so in connection with her Motion to Voluntarily Dismiss. ECF No. 55.

## IV.  MOTION TO VOLUNTARILY DISMISS PURSUANT TO FED. R. CIV. P. 41(A)(2)

For the reasons set forth in this Section, the Court **FINDS** that Plaintiff's Corrected Motion to Voluntarily Dismiss seeks to circumvent an adverse ruling and would result in legal prejudice to Defendant. The Court, therefore, **DENIES** Plaintiff's Corrected Motion for Leave to Voluntarily Dismiss. ECF No. 55.

### A.  STANDARD OF REVIEW

Pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure, once an opposing party serves a motion for summary judgment the plaintiff may only voluntarily dismiss an action by

court order.  Rule 41(a)(2) provides that a court may grant a plaintiff's request to voluntarily dismiss "on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2).

The Fourth Circuit has held that "[a] plaintiff's motion to voluntarily dismiss a claim should not be denied absent plain legal prejudice to the defendant." Ellett Bros., Inc. v. U.S.

Fidelity & Guar. Co., 275 F.3d 384, 388 (4th Cir. 2001) (citing Andes v. Versant Corp., 788 F.2d 1033, 1036 (4th Cir. 1986)).

> The Fourth Circuit has identified four general factors . . . [a court should] consider regarding the question of prejudice: "(1) the opposing party's effort and expense in preparing for trial; (2) excessive delay or lack of diligence on the part of the movant; (3) insufficient explanation of the need for a dismissal; and (4) the present stage of the litigation, i.e., whether a motion for summary judgment is pending."

Khair v. Countrywide Home Loans, Inc., No. 1:10-cv-410, 2011 WL 652406, at *2 (E.D. Va. Feb. 10, 2011) (quoting Teck Gen. Pshp. V. Crown Cent. Petroleum Corp., 28 F. Supp. 2d 989, 991 (E.D. Va. 1998)).  It is also "settled that a plaintiff may not obtain a non-prejudicial voluntary dismissal simply to circumvent adverse rulings." Teck Gen., 28 F. Supp. 2d at 992 (citing Paturzo v. Home Life Ins. Co., 503 F.2d 333, 336 (4th Cir. 1974)).

## B.    DISCUSSION

The Court **FINDS** that Plaintiff's Motion seeks to circumvent an adverse ruling and would result in legal prejudice to Defendant. See Francis v. Ingles, 1 Fed. Appx. 152, 154 (4th Cir. 2001) (affirming district court's denial of Rule 41(a)(2) motion to voluntarily dismiss due to "plaintiff's lack of diligence, noncompelling reason for the dismissal, and inconvenience dismissal would have imposed on the defendant").

24

1.  **Procedural History Underlying Plaintiff's Attempt to Voluntarily Dismiss the Instant Action**

As explained in Part II of this Opinion and Order, the Court issued an Order on August 3, 2012 granting in part and denying in part Defendant's Motion to Dismiss.  Ord., ECF No. 13. The Order dismissed Plaintiff's discrimination claims, leaving only Plaintiff's claim that Defendant, in denying her application for tenure, took retaliatory action against Plaintiff motivated by her filing of a charge with the EEOC.  See generally Ord., ECF No. 13.

Shortly thereafter, on August 23, 2012, Plaintiff filed a Second EEOC Charge.  As Plaintiff has acknowledged, the Second EEOC Charge does not raise any new claims, but rather seeks relief

> for unlawful discrimination against her on the basis of her race by Old Dominion University in connection with Hentosh's application for and denial of tenure, which under the Court's prior ruling she is not permitted to pursue in the case now before the Court, as well as seeking relief for unlawful retaliation, which is the issue to be tried in the case now before the Court.

Pl.'s Br. in Supp. of Mot. to Stay 2, ECF No. 25 (emphasis added).  Thus, by Plaintiff's own admission, the Second EEOC Charge merely seeks to resurrect those discrimination claims dismissed by the Court's prior Order due to Plaintiff's failure to properly exhaust her administrative remedies.  Plaintiff did not feel compelled to provide the Court with timely notice of that Second EEOC Charge, nor did she move for a stay of these proceedings at that early stage of the litigation.

Discovery on Plaintiff's retaliation claims closed on February 12, 2013.  See Rule 16(b) Sch. Ord., ECF No. 20.  Defendant has alleged, and Plaintiff has never contested, that Plaintiff failed to conduct timely discovery, took no depositions, and issued no subpoenas with respect to the retaliation claims currently before the undersigned.  See Def.'s Resp. to Mot. to Stay 6, ECF No. 29 (alleging that Plaintiff has not diligently pursued discovery in this matter); Pl.'s Reply to

25

Mot. to Stay 3, ECF No. 33 (addressing Defendant's arguments concerning Plaintiff's failure to diligently pursue discovery, but failing to contest any of the arguments which support that allegation).

On March 13, 2013, Defendant filed its Motion for Summary Judgment. ECF No. 21. Then, on March 22, 2013, Plaintiff filed a Motion to Stay and Consolidate. ECF No. 24. That Motion, filed approximately <u>seven months</u> after the Second Charge was filed with the EEOC, was the first time the Court heard of any Second EEOC Charge. On March 31, 2013, the EEOC issued Plaintiff a Right to Sue Notice on her Second EEOC Charge. Pursuant to that Notice, Plaintiff was required to file a Complaint concerning any claims set forth in the Second EEOC Charge on or before July 2, 2013.

On April 15, 2013, the Court scheduled a Motion Hearing to address Defendant's Motion for Summary Judgment, as well as the many other motions Plaintiff had pending before the Court. The hearing was initially scheduled for May 20, 2013 but, due to a scheduling conflict, the hearing was reset to occur on May 28, 2013.

On May 21, 2013, with her Motion to Stay and Consolidate still pending, Plaintiff proceeded to file a separate action based on discrimination and retaliation allegations advanced in her Second EEOC Charge. That action, docket number 2:13cv290, is currently pending before District Judge Henry C. Morgan, Jr. That same day, however, Plaintiff also filed an Amended Motion to Consolidate and Stay Proceedings in this matter. ECF No. 46. Plaintiff's Amended Motion seeks to stay these proceedings and consolidate this matter with that now pending before Judge Morgan.

On June 4, 2013, the Court issued an Order denying Plaintiff's Motions to Stay and Consolidate. The Court explained that granting such motion would prejudice Defendant

26

because: (1) the case before the undersigned and that before Judge Morgan are at vastly different stages of litigation; and (2) consolidation would permit Plaintiff to remedy her failure to diligently pursue discovery in the instant action.  The Court further stated that it was disinclined to grant such Motion because the source of all this delay and confusion was Plaintiff's failure to properly exhaust her administrative remedies under Title VII prior to commencing the instant action.  Ord., ECF No. 50.

### 2.    Voluntary Dismissal Would Permit Plaintiff to Circumvent An Adverse Ruling and Legally Prejudice Defendant

First, the Court **FINDS** that Plaintiff's Motion to Voluntarily Dismiss merely serves to circumvent the adverse ruling issued with respect to Plaintiff's Motions to Stay and Consolidate. Rather than await ruling on her original Motion to Stay, Plaintiff filed a second complaint which alleges the very same retaliation claims pending before the undersigned.  Plaintiff then sought to stay these proceedings and consolidate the instant action with that now pending before Judge Morgan.  For reasons discussed in the previous subsection, the Court denied Plaintiff's Motions to Stay and Consolidate.  See Ord., ECF No. 50.  The instant Motion to Voluntarily Dismiss seeks to circumvent that ruling, as it would leave Plaintiff in the same position as if the Court had granted her Motions to Stay and Consolidate—Plaintiff would have another opportunity to litigate her discrimination and retaliation claims in a single suit, taking full discovery on both. This is a not a compelling justification for non-prejudicial dismissal under Rule 41(a)(2).  See Francis, 1 Fed. Appx. at 154.

Second, the Court **FINDS** that Plaintiff's Motion would legally prejudice Defendant. Plaintiff failed to conduct timely discovery, took no depositions, and issued no subpoenas with respect to the retaliation claims pending before the undersigned.  Discovery on those claims ended nearly five months ago and now, just two weeks before trial and after a hearing on

Defendant's Motion for Summary Judgment, Plaintiff moves for voluntary dismissal.  Because the action before Judge Morgan is at the earliest stages of litigation, voluntarily dismissing the instant action would allow Plaintiff to remedy her lack of diligence on these retaliation claims. Granting Plaintiff's Rule 41(a)(2) Motion would, therefore, legally prejudice Defendant because it would afford Plaintiff another opportunity to remedy her failure to diligently pursue discovery in the instant action.

## V.     DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.     DEFENDANT'S MOTION IS NOT A PARTIAL MOTION FOR SUMMARY JUDGMENT

Plaintiff argues that Defendant's Motion for Summary Judgment should, at best, be treated as a partial Motion for Summary Judgment.   According to Plaintiff's Opposition Memorandum, the Complaint alleges that Defendant retaliated against Plaintiff by: (1) permitting Dr. Jeng to participate in the College Committee's consideration of Plaintiff's tenure application, Compl. ¶¶ 20-21, 26, ECF No. 1; (2) having Shelly Mishoe ("Mishoe"), Dean of the College of Health Sciences, vote against Plaintiff's tenure application, Compl. ¶¶ 101-02, ECF No. 1; (3) denying Plaintiff's request for further review of her tenure application, Compl. ¶¶ 22-23, ECF No. 1; and (4) denying Plaintiff's tenure application, see generally Compl., ECF No. 1.

The Court finds that Defendant's Motion for Summary Judgment is not partial.  First, Defendant clearly addressed Jeng's participation in the HS Promotion and Tenure Committee's consideration of Plaintiff's tenure application. See Def.'s Mem. in Supp. of Mot. for Summ. J. 16-17, ECF No. 22.   Second, Defendant addressed Dean Mishoe's review of Plaintiff's application for tenure, having insisted that Dean Mishoe was "unaware of Hentosh's earlier Charge at the time she reviewed Hentosh's application for tenure." See Def.'s Mem. in Supp. of Mot. for Summ. J. 17, ECF No. 22.  Third, Defendant addressed Provost Carol Simpson's letter, dated April 11, 2012, informing Plaintiff that her request for further review was untimely. See

Def.'s Mem. in Supp. of Mot. for Summ. J. 17, ECF No. 22 (discussing Provost Simpsons letter and noting that "Hentosh does not dispute that the policy of the ODU Board of Visitors requires the Board to consider tenure cases before April 15 of the year in which the case was taken up"). Finally, Defendant's Memorandum in Support of Motion for Summary Judgment generally addresses Plaintiff's denial of tenure, having argued that Plaintiff was denied tenure for

legitimate, non-pretextual reasons. See Def.'s Mem. in Supp. of Mot. for Summ. J. 17-20, ECF No. 22.

The Court **FINDS** that Defendant's Memorandum in Support of its Motion for Summary Judgment, ECF No. 22, addresses all of the alleged retaliatory actions set forth in Plaintiff's Complaint, ECF No. 1. Having so found, the Court will proceed to consider the merits of Defendant's Motion for Summary Judgment.

### B. STANDARD OF REVIEW

Defendant moves for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In consideration of a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405 (4th Cir.2005). Summary judgment will, however, "be granted unless 'a reasonable jury could return a verdict for the nonmoving party' on the evidence presented." Kelley v. United Parcel Service, Inc., No. 12-2343, 2013 WL 2480211, at *1 (4th Cir. June 11, 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case." Id. (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)).

29

Plaintiff's claims that she was retaliated against for engaging in protected activity under Title VII is to be analyzed under the shifting burdens framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), and its progeny, see Hux v. City of Newport News, Va., 451 F.3d 311, 314 (4th Cir. 2006) (citing Hawkins v. PepsiCo, Inc., 203 F.3d 274, 278 4th Cir. 2000)).  Under that framework, a plaintiff employee must first establish a prima facie case of retaliation by showing that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal nexus between the protected activity and adverse action.  Brockman v. Snow, 217 Fed. Appx. 201, 206 (4th Cir. 2007) (citing McNairn v. Sullivan, 929 F.2d 974, 980 4th Cir. 1991)).  However, as explained by the Supreme Court in Nassar, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  2013 WL 3155234, at *10 (citing Gross, 557 U.S. at 176).  If the prima facie case is made, the burden shifts to the employer "to demonstrate a legitimate non-discriminatory reason for the adverse employment action."  Brockman, 217 Fed. Appx. at 205 (citing Hux, 451 F.3d at 314).    If the employer provides a legitimate non-discriminatory reason, the burden shifts back to the plaintiff employee to "prove that this reason was actually a pretext for" retaliation.  Id. (citing Hux, 451 F.3d at 315).

C.    DISCUSSION

1.    **Plaintiff Fails to Produce Evidence That Retaliation Was the But-For Cause of Dr. Jeng's Participation in the College Committee's Consideration of Plaintiff's Tenure Application**

Plaintiff alleges retaliation based on Jeng's participation on the HS Promotion and Tenure Committee when it considered Plaintiff's tenure application.  Compl. ¶¶ 20-21, 26, ECF No. 1. The Court finds that Plaintiff fails to establish a prima facie case of retaliation with respect to this claim, as there is insufficient evidence of a causal nexus between Defendant's protected activity and Dr. Jeng's participation on the Committee.

First, the Court finds that Jeng was a duly-elected member of the HS Promotion and Tenure Committee. The Faculty Handbook does not provide a mechanism by which a tenure applicant can request, much less compel, recusal of a college committee member based on an alleged conflict of interest. This, alone, would provide ample non-retaliatory justification for Jeng's participation on the HS Promotion and Tenure Committee when it considered Plaintiff's application. As such, Plaintiff cannot show that retaliatory motive was the but-for cause of Jeng's participation on the HS Promotion and Tenure Committee.

Second, a careful review of the email exchanges between Plaintiff and Sophie Thompson, Chair of the School of MLRS, evidences that Plaintiff never actually requested Jeng's recusal. Plaintiff merely inquired as to how she might make such a request. She inexplicably ended her efforts at securing Jeng's recusal on September 29, 2011, more than one month prior to the HS Promotion and Tenure Committee convening to consider her application on November 1, 2011. Having neither formally requested Jeng's recusal, nor persisted in her efforts to secure Jeng's recusal, Plaintiff cannot show that retaliatory motive was the but-for cause of Jeng's participation on the HS Promotion and Tenure Committee.

Accordingly, the Court **FINDS** that Plaintiff fails to marshal sufficient evidence from which a reasonable jury could find that retaliation was the but-for cause of Jeng's participation on the HS Promotion and Tenure Committee.

### 2. Plaintiff Fails to Produce Evidence That Retaliation Was the But-For Cause of Dean Mishoe's Refusal to Support Plaintiff's Tenure Application

Plaintiff alleges retaliation based on Dr. Mishoe, Dean of the College of Health Science, refusing to support Plaintiff's tenure application following an independent review.

As set forth above, Plaintiff was hired pursuant to a solicitation that provided:

[t]he candidate will teach clinical molecular diagnostics and research statistics at

31

> both the undergraduate and graduate levels, assist in the development of a
> graduate program, and foster collaborative research initiatives with the local
> medical community.  The candidate will also be expected to establish partnerships
> with   clinical   biotechnology   industries   pioneering   the   development   of
> instrumentation and methodologies in the area of clinical molecular diagnostics.
> The candidate will be expected to develop and maintain an active research
> program supported by external funding.

Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 8, ECF No. 22-8 (emphasis added).  At her mid-

tenure review, the HS Promotion and Tenure Committee emphasized that, with respect to

external funding, Plaintiff had only secured two internally funded grants, and submitted only "11

grants to external federal agencies."  Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1, at 34-36,

ECF No. 22-1.  This evidenced that Plaintiff had made little progress toward obtaining tenure

since her second annual review.

Accordingly, the HS Promotion and Tenure Committee found that "Dr. Hentosh's record

of research and scholarship does not demonstrate sufficient progress toward tenure and

promotion to assure that her application in two years will be competitive."  The Committee

"strongly recommend[ed] that . . . [Plaintiff] build the number of senior authored publications in

her field which is needed to document a well defined research area needed to be competitive in

obtaining external funding."  The Committee stressed that "[b]oth publications and external

funding" would prove "vital at the time of her tenure application."  Def.'s Mem. in Supp. of Mot.

for Summ. J. Ex. 1, at 34-36, ECF No. 22-1.  The HS Promotion and Tenure Committee

concluded by making four recommendations to improve the prospects of Plaintiff's future tenure

application.  Amongst them, the Committee requested that Plaintiff "[i]ncrease her track record

of external—particularly NIH—research funding."  Def.'s Mem. in Supp. of Mot. for Summ. J.

Ex. 1, at 34-36, ECF No. 22-1.

Three years later, when Plaintiff submitted her tenure application, she had still made no

progress in securing external funding.  In fact, the only funding that Plaintiff secured during her

seven-year probationary period at ODU were the two internally funded grants she received during her first two years at the University. Plaintiff's failure to secure external funding played a major role in Mishoe's refusal to support her application for tenure. Plaintiff was hired pursuant to a solicitation which provided that the "[t]he candidate will be expected to develop and maintain an active research program supported by external funding." Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 8, ECF No. 22-8 (emphasis added). The Faculty Handbook also states that tenure applicants will be assessed based on, amongst other things, the publications, grants, and contracts the candidate produced during their probationary period.

In refusing to support Plaintiff's tenure application, the MLRS Promotion and Tenure Committee found "that Dr. Hentosh's performance in the area of scholarship did not fully meet expectations for tenure." Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1, at 37-39, ECF No. 22-1. Likewise, the HS Promotion and Tenure Committee noted, in discussing "Research and External Funding," that Plaintiff's success in obtaining external funding was "lower than expected." The HS Promotion and Tenure Committee ultimately found that Plaintiff's "scholarly activities fall below expectations of a tenured faculty member."

It was in this context that Dean Mishoe independently assessed Plaintiff's tenure application. She, too, found that Plaintiff had "been unable to establish a research program in cancer research or related areas, reflected by her lack of grants, publications and national presentations." Mishoe also noted that Plaintiff had "obtained . . . no externally funded grants." Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 28, at 1-2, ECF No. 31-34. Thus, Mishoe concluded that "[i]n research and scholarly activities since joining ODU in 2006, Dr. Hentosh's scholarship, publications and external funding are below the level expected for tenure." Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J. Ex. 28, at 2, ECF No. 31-34.

On these facts, Plaintiff cannot establish that retaliatory motive was the but-for cause of Dean Mishoe's refusal to support Plaintiff's tenure application. Plaintiff was hired with the expectation that she would "develop and maintain an active research program supported by external funding." Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 8, ECF No. 22-8 (emphasis added). Plaintiff was warned, at her mid-tenure review, that her progress in satisfying that expectation fell below the standard of tenured faculty. Three years later, Plaintiff had still made no progress in her efforts to secure external funding. As with the MLRS and HS Promotion and Tenure Committees, the evidence clearly shows that Dean Mishoe had a legitimate, non-retaliatory basis for declining to support Plaintiff's tenure application. Therefore, the Court **FINDS** that Plaintiff fails to marshal evidence from which a reasonable juror could find that retaliation was the but-for cause of Mishoe's refusal to support Plaintiff's tenure application.

### 3. Plaintiff Fails to Produce Evidence That Retaliation Was the But-For Cause of Provost Carol Simpson's Denial of Plaintiff's Request for Further Review

Plaintiff claims retaliation based on Provost Carol Simpson's letter, dated April 11, 2012, informing Plaintiff that her request for further review of her tenure application was untimely. See Def.'s Mem. in Supp. of Mot. for Summ. J. 17, ECF No. 22 (discussing Provost Simpsons letter and nothing that "Hentosh does not dispute that the policy of the ODU Board of Visitors requires the Board to consider tenure cases before April 15 of the year in which the case was taken up").

The HS Promotion and Tenure Committee issued its recommendation against Plaintiff's tenure application on November 1, 2011. Dean Mishoe issued her recommendation against the application on December 15, 2011. Approximately four months later, on April 6, 2012, Plaintiff submitted a request for further review to Provost Simpson. Simpson responded on April 11, 2012, explaining to Plaintiff that the Schedule for Faculty Seeking Tenure, set forth in the

34

Faculty Handbook, required submission of her request for further review on or before December 20, 2011. Having failed to satisfy that deadline, Provost Simpson stated that she would be "unable to consider" Plaintiff's request. Def.'s Mem. in Supp. of Mot. for Summ. J. Ex. 1, at 42, ECF No. 22-1.

Plaintiff's claim of retaliation attempts to exploit a poorly written portion of the "Schedule for Faculty Seeking Tenure," which is set forth in the Appendix to the Faculty Handbook. Specifically, Plaintiff takes issue with provision which provides that "[i]n those cases where the faculty member requested further review because neither the department/school committee nor the department/school chair recommends tenure, the faculty member may request a review by the provost and vice president for academic affairs if neither the college committee nor the dean recommends tenure" on or before December 20, 2011. Pl.'s Br. in Opp. to Def.'s Mot. for Summ. J., at 313, ECF No. 31-2.

The Court finds Plaintiff's claim to be meritless. First, read in its totality, any reasonable reader of the Faculty Handbook and Schedule would conclude that Plaintiff was required to request further review of her application on or before December 20, 2011. Second, to the extent that the particular sentence cited by Plaintiff is confusing, she certainly cannot establish that retaliation was the but-for cause of Provost Simpson's refusal to grant Plaintiff request for further review. Plaintiff inexplicably waited nearly four months after receiving Dean Mishoe's letter declining to support Plaintiff's tenure application before submitting a request for further review by Provost Simpson. The Schedule is clear that, by March 15, 2011, the Provost makes determinations concerning tenure, and any favored applications are forwarded to ODU's President for presentation to the Board of Visitors. The Board makes its determinations on or

before April 15, 2011. On these facts, Plaintiff cannot establish that retaliation was the but-for cause of Provost Simpson's denial of her request for further review.

Therefore, the Court **FINDS** that Plaintiff fails to marshal evidence from which a reasonable juror could find that retaliation was the but-for cause of Provost Simpson's refusal to grant further review of Plaintiff's tenure application.

### 4.   Plaintiff Fails to Produce Evidence That Retaliation Was the But-For Cause of Defendant's Denial of Plaintiff's Tenure Application

More generally, Plaintiff's argues that Defendant's denial of her application for tenure is evidence of retaliation. For the reasons set forth in Part V(C)(2) of this Opinion and Order, the Court **FINDS** that Plaintiff fails to marshal evidence from which a reasonable juror could find that retaliation was the but-for cause of Defendant's denial of Plaintiff's tenure application. The evidence in this matter shows that Plaintiff failed to meet the standards of tenured faculty. Plaintiff's application for tenure was denied accordingly.

## VI.   CONCLUSION

For the reasons set forth herein, the Court: (1) **DENIES** Plaintiff's Motion for Leave to File Brief addressing the implications of Univ. of Texas Sw. Med. Ctr. v. Nassar, 12-484, 2013 WL 3155234, at *10 (June 24, 2013), ECF No. 51; (2) **DENIES** Plaintiff's Corrected Motion to Voluntarily Dismiss, ECF No. 55; and (3) **GRANTS** Defendant's Motion for Summary Judgment, ECF No. 21. The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED**.

Robert G. Doumar
Senior United States District Judge

UNITED STATES DISTRICT JUDGE

Norfolk, VA
July _12_, 2013